# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| JENNIFER MOSLEY, o/b/o | ) | |
| S.W., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case number 2:10cv0045 JCH** |
| | ) | **TCM** |
| MICHAEL J. ASTRUE, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (the Commissioner), denying the application for supplemental security income benefits (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383b, filed on behalf of S.W. (Plaintiff) by her mother, Jennifer Mosley, is before the undersigned for a review and recommended disposition. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Ms. Mosley applied for SSI on Plaintiff's behalf in March 2007, alleging Plaintiff was disabled since birth due to attention deficit hyperactivity disorder (ADHD), asthma, and a

speech impairment.  (R.[1] at 67-72.)  This application was denied initially and following an administrative hearing in February 2009 before Administrative Law Judge (ALJ) F. Terrell Eckert, Jr.  (Id. at 4-16, 19-39.)  The Appeals Council denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Ms. Mosley, represented by counsel, testified at the administrative hearing.  Plaintiff was present but did not testify.

Ms. Mosley testified that her daughter, Plaintiff, was currently in the first grade.  (Id. at 8.) She had attended two schools when in kindergarten the year before.  (Id. at 9.)  When in kindergarten in Mexico, Missouri, during the first half of the school year, she was always in trouble.  (Id.)  She would talk when she was not supposed to and would not do something when a teacher told her to.  (Id.)  She had received a one-day in-school suspension after grabbing a child who had pushed her in the cafeteria.  (Id.)

Plaintiff's behavior improved after they moved to Paris, Missouri, and she changed schools.  (Id. at 10.)  She is having problems reading and speaking.  (Id.)  She gets into trouble and gets other children to misbehave.  (Id.)

---

[1]References to "R." are to the administrative record electronically filed by the Commissioner with his answer.

Plaintiff is in special education classes for twenty minutes three times a week.  (Id. at 11.)  Her teacher tells Ms. Mosley that Plaintiff does not stay on task and disrupts the class.  (Id.)

When at home, Plaintiff hits and kicks her younger, four-year brother "a couple of times a week."  (Id. at 11, 14.)  She kicks him as she storms out of a room when she is mad or kicks him when he is aggravating her.  (Id. at 14.)  She has never "actually hurt him."  (Id. at 5.)  She won't do what Ms. Mosley tells her to do and has a bad temper.  (Id. at 11.)  She screams and yells a lot.  (Id. at 12.)  She will throw a book when she gets frustrated trying to sound out a word she does not know.  (Id.)  If she watches television, she can focus for only approximately ten minutes.  (Id.)

Plaintiff is taking medication, which helps "to an extent."  (Id. at 12-13.)  The medication causes side effects of sleeplessness and crying spells.  (Id. at 13.)  Her doctor had given her medication to help her sleep; however, Ms. Mosley unilaterally stopped it after Plaintiff was unable to sleep for three days.  (Id.)

Plaintiff occasionally has problems with asthma, usually when she is running or in physical education class.  (Id. at 14.)  She has asthma more frequently in the spring.  (Id. at 15.)  She uses an inhaler when necessary.  (Id. at 14.)

The only other problem Ms. Mosley has with Plaintiff is her reluctance to go to bed.  (Id.)

## **Medical, School, and Other Records Before the ALJ**

The records before the ALJ included reports Ms. Mosley completed as part of the application process, school records, and medical records.

When applying for SSI for Plaintiff, Ms. Mosley completed a Disability Report. (<u>Id.</u> at 101-09.) Plaintiff was then three feet tall and weighed thirty pounds. (<u>Id.</u> at 101.) She has been disabled since her birth in 2001. (<u>Id.</u> at 102.) She takes Adderall for her ADHD and mirtazapine (an antidepressant and the generic form of Remeron) for sleep. (<u>Id.</u> at 105.) She is in speech therapy. (<u>Id.</u> at 107.)

On a Function Report form for children ages three to six, Ms. Mosley reported that Plaintiff does not have any problems seeing or hearing. (<u>Id.</u> at 93-94.) She has a limited ability to communicate in that she does not ask a lot of what, why, and where questions. (<u>Id.</u> at 96.) She can do the other seven activities listed. (<u>Id.</u>) Her impairments limit her progress in understanding and using what she has learned in that she does not ask what words mean, does not know her telephone number, and does not understand a joke. (<u>Id.</u> at 97.) She does not have a problem in the other eight activities. (<u>Id.</u>) Her physical abilities are not limited. (<u>Id.</u> at 98.) Her impairments affect her behavior with other people in that she does not enjoy being with other children of the same age, does not share toys, does not take turns, and does not play board games. (<u>Id.</u>) She does show affection toward other children, show affection toward her parents, play "pretend" with other children, and play games like tag and hide-and-seek. (<u>Id.</u>) Ms. Mosley is not sure if Plaintiff's impairments affect her ability to take care of her personal needs. (<u>Id.</u> at 99.) Plaintiff's ability to pay attention and stick with a task is limited in that she can do so for only fifteen minutes. (<u>Id.</u>)

Ms. Mosley completed a Disability Report – Appeal form after the initial denial of Plaintiff's SSI application.  (Id. at 152-57.)  There were no new concerns or illnesses and no changes in Plaintiff's limitations since the initial report had been completed.  (Id. at 153.) In addition to the Adderall, Plaintiff was taking Albuterol for her asthma and imipramine, an antidepressant, to help her sleep.  (Id. at 154.)  The only side effect from her three medications were with the imipramine – it made her sleepy.  (Id.)

Plaintiff's school records before the ALJ begin with the January 2007 development of an Individualized Education Program (IEP) for Plaintiff when she was in pre-kindergarten in the Mexico public schools, in the 2006/2007 school year.[2]  (Id. at 80-89, 111-20.) Plaintiff was described as having a sound system disorder, see note 10, infra, which occasionally interfered with her interactions with peers and adults due to their difficulty understanding her.  (Id. at 81, 112.)  When this happened with peers, she would often choose to play by herself.  (Id.)  Her strengths were being polite and a hard worker, following directions at school, playing well alone, and willingness to play with peers when they initiated the play.  (Id.)  Her mother's concerns were with Plaintiff being difficult  to get up in the morning and becoming frustrated when people were unable to understand her.  (Id.) Plaintiff was assessed as having communication needs.  (Id. at 82, 113.)  She did not exhibit behaviors that impeded hers or other's learning.  (Id.)  Two goals were developed for Plaintiff:  (1) increasing her use of target sounds and processes to 80% accuracy during

_____

[2]In her brief in support of her complaint, Plaintiff mistakenly refers to this IEP as being developed in January 2008.

spontaneous speech on three consecutive occasions, and (2) increasing her use of age appropriate syntax to the same degree and frequency. (Id. at 83, 114.) To help Plaintiff achieve these goals, she was to receive speech therapy for a total of sixty minutes each week. (Id. at 85, 86, 115.)

Another IEP was developed for Plaintiff when she was in kindergarten in the Paris public schools. (Id. at 159-70.) It was noted that Plaintiff's sound system disorder made it difficult for her to communicate with peers and adults in an academic setting. (Id. at 160.) She "may also exhibit difficulties in forming sound/symbol relationships in the classroom." (Id.) Her strengths were being polite, a hard worker, and eager to please. (Id.) Since the prior IEP, Plaintiff had "worked very hard" and was "able to produce /k and g/ sounds in the initial position of words." (Id.) She continued to have problems with the /k and g/ sounds in the medial and final positions of words if not prompted. (Id.) She could use appropriate pronouns (a) if given a reminder at the beginning of a session and (b) sometimes spontaneously in the classroom. (Id.) She continued to have difficulty with tenses and, because she was missing her top four front teeth, with other sounds during connected speech. (Id.) Two goals were developed for Plaintiff: (1) "demonstrat[ing] increased speech intelligibility by eliminating the phonological process of final consonant deletion in words with 80% accuracy on 20 trials over 3 consecutive sessions," and (2) "demonstrat[ing] increased speech intelligibility by accurately producing the /k and g/ sounds in all positions of all syllables and words with 85% accuracy in 20 trials over 3 consecutive sessions." (Id. at 162.) To help Plaintiff achieve these goals, she was to receive speech/language therapy

for a total of sixty minutes each week.  (Id. at 163.)  She was to be in a regular class at least 80% of the time.  (Id. at 165.)

As noted by Ms. Mosley when testifying, Plaintiff was in the Paris public school for the second half of her kindergarten year.  After the third quarter, her teacher remarked that she had adjusted very well to the classroom and was "a joy to have in the room."  (Id. at 198.)  Her progress report at the end of the fourth quarter indicated that she was demonstrating thirty-five of the forty-seven skills and abilities listed and developing nine of the remaining twelve.  (Id.)  There was no evidence of the other three skills and abilities. (Id.)  In nine skills and activities, Plaintiff had improved from "developing" to "demonstrating" from the third to fourth quarter.  (Id.)  The improvement was particularly remarkable in the area of reading, where she went from "developing" to "demonstrating" in five of the nine skills listed.  (Id.)  She also went from "no evidence" to "developing" in one of the skills.  (Id.)  She continued, however, to show "no evidence" of an ability to recognize rhyming words.  (Id.)

At the beginning of the next school year, in September 2008, another IEP was developed for Plaintiff, who was then in the first grade.  (Id. at 171-75.)  She was to continue receiving a total of sixty minutes each week of speech therapy.  (Id. at 171.)  Plaintiff's teacher expressed concern about Plaintiff's decreased intelligibility in the classroom and her resulting frustration when she was not understood.  (Id. at 172.)  The teacher was also concerned that Plaintiff's speech disorder was affecting her socially.  (Id.)  Ms. Mosley reported that Plaintiff was helpful and tried to teach her brother how to write his name.  (Id.)

The speech therapist reported that Plaintiff was a good listener, hard worker, polite, and friendly. (Id.) It was noted that Plaintiff's front teeth had grown in; she had not had front upper teeth since she was two. (Id.) The presence of the front teeth had positively affected Plaintiff's ability to master /k/, /g/, and /f/ at conversational levels. (Id.) She was working on /t/, /r/, /s/, and /s/ blends. (Id.) One goal was developed for Plaintiff: "demonstrat[ing] increased speech intelligibility by producing target sounds in conversational speech with 90% accuracy." (Id. at 175.) The target sounds were /l/ /s/, /s/ blends, /r/, /r/ blends, /th/, and /ch/.[3] (Id.)

Plaintiff's progress report after the first quarter of first grade was less positive than was the last report from kindergarten. (Id. at 199.) She was assessed as "demonstrating" only eleven of the thirty-one skills and abilities listed. (Id.) Her weakest area was in the language arts. (Id.) Her strongest areas were mathematics and work habits/personal growth. (Id.) In the latter area, Plaintiff was "demonstrating" an ability to, among other things, participate in discussion and activities, show respect to others, cooperating with others, and taking turns. (Id.) The teacher noted that Plaintiff was having "a very hard time paying attention and staying on task despite being moved several times." (Id.) "This [was] causing her extreme academic difficulty." (Id.)

Plaintiff's medical records before the ALJ are summarized below in chronological order.

_____

[3]See note 10, infra.

Plaintiff's hearing was screened when she was one month old and found to be "adequate for hearing speech and learning oral language."  (Id. at 250.)

In January 2002, Plaintiff was taken to the Audrain Medical Center emergency room to be seen for increased sneezing and coughing and for a loose green stool.  (Id. at 262-66.) The impression was of an ear infection and upper respiratory infection.  (Id. at 266.)

In November 2002, Plaintiff was seen at the emergency room after refusing to drink milk the day before.  (Id. at 254-58.)  She had been on medication for three days for an ear infection and had been running a fever for five days.  (Id. at 254.)  She was to continue on the ear infection medication and her mother was to contact her pediatrician, Nancy J. Bunge, M.D.,[4] if Plaintiff did not improve.  (Id.)  Five days later, she returned to the emergency room after developing an allergic reaction, i.e., hives, to a medication given her for an ear infection.  (Id. at 251-53.)

In April 2003, Plaintiff was treated at the emergency room for diarrhea, vomiting, coughing, and decreased appetite.  (Id. at 288-91.)  A chest x-ray indicated possible early pneumonia.  (Id. at 289.)  She was given antibiotics and released with instructions to her parents to alternate Tylenol and Motrin every three hours to control her temperature.  (Id. at 289.)

---

[4]Nancy J. Bunge, M.D., began as Plaintiff's pediatrician five days after her birth.  (Id. at 235, 244.) The majority of Plaintiff's visits to Dr. Bunge were for upper respiratory infections and asthma-related problems.  (Id. at 240-44, 318-20.)

In June 2004, an audiologist again examined Plaintiff due to her mother's concern about her speech articulation and chronic ear infections.  (Id. at 286.)  The audiologist found Plaintiff's "arctic errors [to be] pretty much expected for her age."  (Id.)  Plaintiff was "very verbal" and was "obviously practicing her speech quite a bit."  (Id.)  Her utterances of two to three words in length were appropriate for her age.  (Id.)  Her hearing was normal and was adequate for learning speech.  (Id.)

In November, Plaintiff was taken to the emergency room after she had pain urinating. (Id. at 282-85.)  Her mother expressed concern that Plaintiff's father might have abused her during a visit.  (Id. at 282.)  Two weeks later, Plaintiff returned to the emergency room after vomiting since early morning.  (Id. at 274-79.)  She had been bitten by a cat the day before. (Id. at 274.)  Her blood cultures were negative; she was given medication and released.  (Id. at 276.)

In February 2005, Plaintiff was taken to the emergency room after she chewed some of her grandfather's Effexor (an antidepressant) medication.  (Id. at 227-32.)  Plaintiff was treated and released within two hours.  (Id. at 229, 232.)

In March, Plaintiff had tubes placed in her ear in response to recurrent ear infections and ear wax impaction.  (Id. at 225-26, 246.)

In June, Plaintiff underwent a speech and language evaluation by Janice Brockus, CCC-SLP,[5] with the Audrain City-County Health Unit.  (128-30, 187-89.)  Her responses

---

[5]Certificate of Clinical Competency – Speech-Language Pathology.  See What does CCC-SLP stand for?,  http://www.acronymfinder.com/Certificate-of-Clinical-Competence-in-Speech_Language-Pathology (last visited May 5, 2011).

to the Goldman Fristoe Test of Articulation revealed 58 articulation errors with a percentile rank of 1; a 60% intelligibility in unstructured conversation; and errors predominantly in the use of bilabials[6] in initial word position and final consonant deletion. (Id. at 128-29, 187-88.) Ms. Brockus noted that Plaintiff "engaged in turn taking and answered questions appropriately"; "readily engaged in conversation – asking and answering questions"' "narrated her play activities using complete sentences"; and had inconsistent speech sound errors. (Id. at 129, 188.) The conclusion was that Plaintiff had a speech/language disorder "characterized by decreased speech intelligibility secondary to phonological processing disorder." (Id.) Ms. Brockus recommended that she receive thirty to sixty minutes a week of skilled speech and language therapy. (Id.)

The following week, on June 22, Plaintiff was evaluated by John R. Hall, M.D., at the Arthur Center. (Id. at 297-303.) She had been referred by Dr. Bunge based on reports by her mother that she was mean to her brother, yelled, spit, and did not obey or listen to her mother. (Id. at 297.) She lived with her 24-year old mother, who stayed at home and had a history of depression, her younger brother, her younger brother's father, and the father's mother. (Id.) Her biological father, who had spent time in prison for molesting a seven-year old girl, had molested Plaintiff once and no longer had any contact with her. (Id. at 298, 299.) Her problems had begun when she started daycare. (Id. at 298.) She had problems with articulation when speaking. (Id. at 299.) On examination, she was poorly groomed,

---

[6]"Bilabial sounds are those sounds made by the articulation of the upper teeth towards the lower lip. Examples of such sounds in English are . . . [f], [v]." The Language Project, Consonants I: Part 3, http://www.ic.arizona.edu/~lsp/Phonetics/ConsonantsI/Phonetics2c.html (last visited May 5, 2011).

uncooperative, overly friendly, and unable to concentrate. (Id. at 300.) At one point, she

started crying and threw a tantrum. (Id.) Dr. Hall diagnosed a disruptive disorder, not

otherwise specified,[7] and was to rule out ADHD and oppositional defiant disorder. (Id. at

303.) He also concluded that there were problems with parenting, recommended a book on

parenting, and referred Plaintiff to family therapy and play therapy. (Id.) He rated her

Global Assessment of Functioning[8] (GAF) as 45.[9] (Id.) Plaintiff was to return in two

months. (Id.)

Two months later, Plaintiff underwent a speech evaluation through the Mexico public

schools due to her mother's report that Plaintiff was difficult to understand. (Id. at 121-38,

180.) Plaintiff lived with her mother, younger brother, and her mother's boyfriend. (Id. at

121, 180.) The report of Ms. Brockus was noted and incorporated. (Id. at 128-30, 186-89.)

---

[7]According to the Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) [DSM-IV-TR], each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category. DSM-IV-TR at 4. This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class. Id.

[8]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).

[9]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

Ms. Mosley had no concerns with Plaintiff's cognitive abilities or with her abilities to dress and feed herself. (Id. at 131-32, 190-91.) She also had no significant concerns in the "social/emotional/behavioral" area. (Id. at 135, 194.) It was determined that Plaintiff met the eligibility criteria for a sound system disorder.[10] (Id. at 137, 196.)

In January 2006, Plaintiff was seen at the emergency room for injuries she sustained when she fell on a radiator at school and hit her nose. (Id. at 219-24, 270-72, 422-23.) An x-ray revealed that the swollen, bruised nose was not broken. (Id. at 224.) She was to put ice on it at home. (Id. at 222.)

In February, Plaintiff was treated again at the emergency room when she punctured her mouth after falling when running with a sharp comb in her mouth. (Id. at 215-18, 410-21.) She was given Tylenol for her discomfort and told to eat soft foods that night. (Id. at 218.)

In May, Plaintiff's tonsils were removed.[11] (Id. at 211-14, 387-409.)

In June, Plaintiff was treated at the emergency room for a non-productive cough, runny nose, and shortness of breath. (Id. at 207-10, 233, 374-86.) She was given medication

---

[10]A speech sound disorder "include[s] problems with articulation (making sounds) and phonological processes (sound patterns)." American Speech-Language-Hearing Ass'n, Speech Sound Disorders: Articulation and Phonological Processes, http://www.asha.org/public/speech/disorders/ speechsounddisorders.htm (last visited May 5, 2011) (emphasis omitted). The problems with articulation may morph into a disorder if they persist past an expected age. Id. For instance, a girl is expected to be able to articulate an [l] sound by age five, an [r] sound by age eight, and a [th] sound by six and one-half. See Talking Child, LLC, Speech & Articulation Development Chart, http://www.talkingchild.com/ speechchart.html (last visited May 5, 2011).

[11]The medical records refer to a "history of obstructive sleep apnea." (See id. at 391.) There is no other reference to such a diagnosis.

and released within two hours with instructions to continue taking the medication and to drink a lot of fluids. (Id. at 210, 386.)

Plaintiff returned to Dr. Hall in October 2006 for her problems with sleep and ADHD. (Id. at 295-96.) Specifically, she would go to bed around 10:00 p.m., wake up at midnight, and be up for the remainder of the night. (Id. at 295.) She went to preschool at 11:00 a.m. daily and "ha[d] some good days and bad days." (Id.) She got into trouble at school for not listening to the teacher, for running around the room, and for not sitting still. (Id.) She had been prescribed Adderall by her primary care physician, but it had been stopped when she had her tonsillectomy. (Id. at 295.) The family had then moved and her new physician did not want to prescribe it. (Id.) On examination, Plaintiff had "pretty good eye contact and . . . a distractible flow of thought." (Id. at 296.) "Her mood [was] okay and her affect [was] normal in range and reactivity." (Id.) She was happy and "smart (good at puzzle building)." (Id.) Dr. Hall recommended a trial of Adderall and, to help Plaintiff sleep, Zyprexa. (Id. at 296.) He again rated her GAF as 45. (Id.)

In December, Plaintiff was seen again by the physician, David. B. Bowne, M.D., who had put tubes in her ears. (Id. at 245.) The tube in her left ear was in place. (Id.) The tube in her right ear was out of the ear canal and was lodged in the external auditory canal. (Id.) She had an inflammatory polyp in that ear. (Id.) She was to be given ear drops and, if that did not resolve the infection, to have the tube removed. (Id.)

Plaintiff returned to Dr. Hall in January 2007. (Id. at 294.) Her little brother had been in the hospital and needed a kidney transplant. (Id.) Ms. Mosley had not given

Plaintiff the Zyprexa because she had heard it had not been tested in children.  (Id.)  Another doctor had given Plaintiff Valium, which had "knocked her out for [a] dental procedure."  (Id.)  She continued to have some bad days, but her school reports were very positive.  (Id.)  The Zyprexa was discontinued and Plaintiff was to try Remeron (mirtazapine).  (Id.)

Plaintiff next saw Dr. Hall in March.  (Id. at 293, 322.)  School was going well; Plaintiff was happy.  (Id.)  She was still not sleeping well.  (Id.)  Another sleep medication was tried, and the dosage of Adderall was increased from 15 milligrams to 20.  (Id.)

In July, Dr. Hall described Plaintiff as "doing fine."  (Id. at 323.)  Summer school was "fun."  (Id.)  Ms. Mosley reported that Plaintiff's ADHD medicine had "walked out of the house" and requested patches.  (Id.)  Plaintiff was sleeping well and did not need sleep medication.  (Id.)  Plaintiff had a good flow of thought and was goal directed.  (Id.)  She was prescribed 10 milligram transdermal skin patches of Daytrana.  (Id.)

Plaintiff was treated at the emergency room in August for an infection in her left ear.  (Id. at 363-73.)  Dr. Browne examined her a few days later and found a polyp in that ear.  (Id. at 349-50.)  He noted that she had had only one ear infection during the past year.  (Id. at 349.)  Dr. Browne recommended that the polyp and the tube be removed in the near future.  (Id.)  Both were removed five days later.  (Id. at 343-62.)

Dr. Hall noted in September that Plaintiff continued to like school and sleep well.  (Id. at 324.)  Ms. Mosley had had some problems with applying the patches to Plaintiff's ankle.  (Id.)  Plaintiff had a good mood but a distractible flow of thought.  (Id.)  The dosage on the patches was increased.  (Id.)

In January 2008, Plaintiff again had a good mood and a distractible flow of thought. (Id. at 325.) She was not going to bed until late and fought with her mother in the mornings. (Id.) She was again prescribed Adderall and was additionally prescribed lorazepam for sleep. (Id.)

In March, Plaintiff reported that she was fine. (Id. at 326.) Her mother reported that she was in a different school and had adjusted well. (Id.) They could tell if Plaintiff missed a dose of her medication. (Id.) She was fighting less at home and had made "lots of" friends. (Id.) She had a goal directed flow of thought and an okay mood. (Id.) Dr. Hall renewed her prescriptions for Adderall and lorazepam. (Id.)

Two months later, in May, Plaintiff was treated at the emergency room for a mild skin rash. (Id. at 331-42.)

In June, Plaintiff told Dr. Hall that she had head lice and was staying home from school. (Id. at 327.) Her mother reported that she did not go to bed until 10:30 at night and woke up at 4:00 a.m. (Id.) Her prescriptions were again renewed, but the dosage of Adderall was increased from 15 to 20 milligrams and she was to take the lorazepam at 4:00 p.m. (Id.) Plaintiff was to return in two months. (Id.)

Plaintiff saw another health care provider[12] at the Arthur Center in October for a thirty-minute session. (Id. at 328, 427.) Her mother reported that Plaintiff could not focus her attention at school, forgot instructions in class, could not complete her assignments, and

---

[12]The signature is illegible; however, the similarity between it and the signature on the Medical Source Statement (Child) for Treating Physician to Complete indicates it is a Dr. Taranissi.

would get out of her seat and walk or dance around the classroom. (Id.)  At home, she would knock a chair down and have a temper tantrum.  (Id.)  She slept with her mother at night. (Id.)  She had been out of medication for two weeks.  (Id.)  The "Yes" was circled next to "Medication compliant?" (Id.)  On examination, Plaintiff was found to be alert and oriented, with appropriate clothing and good hygiene, of normal insight and judgment, with normal thought content and a good eye contact, and of an irritable mood.  (Id.)  Her dosage of Adderall was increased to 30 milligrams, with no refills.  (Id.)  Her GAF was 60.[13]  (Id.)

The ALJ also had before him two assessments of Plaintiff functioning abilities completed pursuant to her SSI application and questionnaires also completed pursuant to her application.

A Childhood Disability Evaluation Form (CDEF) was completed in April  2007 by three non-examining consultants. (Id. at 311-16.)  Plaintiff's listed impairments were ADHD, speech/language delays, asthma, and obstructive sleep apnea.[14]  (Id. at 311.)  These impairments were found to be severe, but not so severe as to meet or medically equal an impairment of listing-level severity.  (Id.)  Specifically, Plaintiff was found to have no limitations in the domains of acquiring and using information, attending and complete tasks, and moving about and manipulating objects.  (Id. at 313.)  She had less than marked limitations in the domains of interacting and relating with others, caring for herself, and

---

[13]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

[14]See note 11, supra.

health and physical well-being.  (<u>Id.</u>)  The consultants noted that Plaintiff's teacher had not reported any problems, her January 2007 IEP had stated that she followed directions at school, Dr. Hall had reported in March 2007 that she was doing well, her recurrent ear infections had been addressed with tubes, her obstructive breathing issues had been addressed with a tonsillectomy, and her asthma had only occasionally flared up and had been resolved with Albuterol.  (<u>Id.</u> at 313.)

In December 2008, Dr. Taranissi, see note 12, supra, completed a Medical Source Statement (Child) for Treating Physician to Complete.  (<u>Id.</u> at 425.)  Without explanation, Plaintiff's limitations in the domains of acquiring and using information and of attending and completing tasks were rated as "Extreme."  (<u>Id.</u>)  Her limitations in the domains of interacting and relating with others, moving about and manipulating objects, and caring for self were rated as "Marked."  (<u>Id.</u>)  There was no evidence of any limitations in the domain of health and physical well-being.  (<u>Id.</u>)  These limitations had existed since June 22, 2005.  (<u>Id.</u>)

In March 2007, Jacquelyn Hagan, CCC-SLP, completed a Speech/Language Pathologist Questionnaire submitted to her pursuant to Plaintiff's SSI application.  (<u>Id.</u> at 139-40.)  She had been working with Plaintiff twice a week for a total of sixty minutes since September 2005.  (<u>Id.</u> at 139.)  She reported that Plaintiff's syntax had improved from the initial, informal analysis.  (<u>Id.</u> at 140.)  At the time of that analysis, the intelligibility issues had prevented a formal assessment of Plaintiff's expressive language abilities.  (<u>Id.</u>)  Asked to describe the impact of Plaintiff's speech disorder on her social and academic functioning,

Ms. Hagan replied that Plaintiff was difficult to understand at times and this adversely impacted her social interactions.  (Id.)  Her academic skills were within normal limits.  (Id.)

In March 2007, when Plaintiff was in pre-kindergarten in the Mexico public schools, her teacher, Cary Travis, completed a questionnaire on her behalf.[15]  (Id. at 141-48.)  She reported that there had been an unusual degree of absenteeism because Plaintiff's baby brother had been very ill.  (Id. at 141.)  In the domain of acquiring and using information, Plaintiff had a problem in only one of the ten listed activities, i.e., she had a slight problem with "[p]roviding organized oral explanations and adequate descriptions."  (Id. at 142.)  In the domain of attending and completing tasks, she had a slight problem in one of the twelve applicable activities, i.e., "[s]ustaining attention during play/sports activities," and no problem in the remaining eleven.  (Id. at 143.)  She had no problem in the domains of interacting and relating with others, of moving about and manipulating objects, and of caring for herself.  (Id. at 144-46.)  Ms. Travis commented that Plaintiff seemed to be functioning well.  (Id. at 148.)  She was making progress in her speech.  (Id.)  Ms. Travis had no other concerns about Plaintiff.  (Id.)

Plaintiff's first grade teacher, Tracy Huffman, also competed a teacher questionnaire in January 2009.  (Id. at 204-05.)   Ms. Huffman reported that Plaintiff had trouble

---

[15]Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and who may be "valuable sources of evidence for assessing impairment severity and functioning."  Social Security Ruling 06-03p, 2006 WL 2329939, *3 (S.S.A. 2006).  Such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  Id.

concentrating, completing tasks, understanding more than one verbal direction at a time, and maintaining friendships.  (Id. at 204.)  She would occasionally get behind in her work because she would not continue, forget what she was supposed to do, or lose interest.  (Id.) "She often seem[ed] afraid of authority figures" and would "stare blankly and become verbally unresponsive" when confronted about her negative behavior.  (Id.) Plaintiff would get into trouble for talking, not working, not allowing others to work, getting out of her seat, and causing distractions.  (Id.)

## The ALJ's Decision

After noting that Plaintiff, a preschooler when the SSI application was filed, had clearly not engaged in substantial gainful activity at any relevant time, the ALJ concluded that she had a severe impairment, i.e., ADHD.  (Id. at 26.)  She did not have an impairment that met or functionally or medically equaled an impairment of listing-level severity.  (Id.)

After reviewing Ms. Mosley's testimony and Plaintiff's medical and school records, the ALJ addressed her ability to function in the six domains, finding that she had (1) a less than marked limitation in the five domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for herself, and health and physical well being and (2) no limitation in the domain of moving about and manipulating objects.  (Id. at 27-34.)  The ALJ explained his reasoning as follows.

In the first domain, although Plaintiff had been diagnosed with ADHD and her mother had testified that she had difficulty learning in school, particularly with reading and speech, the school and medical records did not support her mother's testimony or Dr. Taranissi's

- 20 -

findings.  (Id. at 28-29.)  The 2007 IEP indicated that Plaintiff was able to follow directions and that her pre-academic skills were within normal limits.  (Id. at 29.)  She required supplementary schooling for one hour per week and during recess.  (Id.)

In the second domain, the ALJ noted that Ms. Mosley, Dr. Taranissi, and Plaintiff's first-grade teacher had all indicated that Plaintiff had difficulty in this domain.  (Id. at 30.)  The record also showed that she had improved when on Adderall.  (Id.)

In the third domain, interacting and relating with others, the ALJ noted that Plaintiff's educational records did not indicate that her difficulties getting along with others persisted when she was taking her medication.  (Id. at 31.)  Nor did her medical records indicate any specific examples of marked limitations in social functioning.  (Id.)

Any limitations created by Plaintiff's earlier physical impairments were temporary and did not last for a period of at least twelve months.  (Id. at 32.)  Dr. Taranissi's opinion that Plaintiff had marked limitations in the domain of moving about and manipulating objects was not supported by the records.  (Id.)  Plaintiff had no limitations in this domain.  (Id.)

As to the fifth domain, caring for herself, the medical and educational records and Ms. Mosley's testimony did not support a finding of any significant limitations.  (Id. at 33.)  The records from the Arthur Center referred to Plaintiff having a good appearance and appropriate clothing.  (Id.)  She had a less than marked limitation in the domain.  (Id.)

As to the domain of health and physical well-being, Plaintiff's asthma had not caused her any significant long-term limitations, nor did she have any significant side effects from

the Adderall.  (Id. at 34.)  Giving Plaintiff the benefit of the doubt, she had less marked limitations in this domain.  (Id.)

Because Plaintiff did not have an impairment or combination of impairments that resulted in either a "marked" limitation[16] in two domains or an "extreme" limitation in one, she was not disabled within the meaning of the Act.  (Id.)

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Neal ex rel. Walker v. Barnhart**, 405 F.3d 685, 688 (8th Cir. 2005); **Brown ex rel. Williams v. Barnhart**, 388 F.3d 1150, 1152 (8th Cir. 2004); **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 646 (8th Cir. 2004).  "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'"  **England v. Astrue**, 490 F.3d 1017, 1019 (8th Cir. 2007) (quoting Stormo v. Barnhart, 377 F.3d 801,

_____

[16]A child has a "marked" limitation in a domain when her impairment seriously interferes with her ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  A marked limitation is "a limitation that is 'more than moderate' but 'less than extreme.'"  Id.

805 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **Id.**; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

Under the Act, the ALJ inquires into (1) whether the child is currently engaged in substantial gainful activity; (2) whether the child suffers severe impairments or a combination of severe impairments; and (3) whether the child's impairments meet or equal any listed impairments. **Neal**, 405 F.3d at 688; **Garrett**, 366 F.3d at 647; **Brown**, 388 F.3d at 1151-52. If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments (a) cause "marked" limitations in two of six domains and or an "extreme" limitation in one and (b) meet the duration requirement of at least one year. 20 C.F.R. § 416.926a(d); accord **England**, 490 F.3d at 1020 (citing 20 C.F.R. § 416.926a(a)). The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3)

interacting and relating with others, (4) moving about and manipulating objects, (5) caring

for yourself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

## Discussion

Plaintiff argues that the ALJ erred by not finding, as had Dr. Taranissi, that she has

an extreme limitation in the domains of acquiring and using information[17] and of attending

and completing tasks[18] and a marked limitation in the domains of interacting and relating

with others,[19] moving about and manipulating objects,[20] and caring for yourself.[21]   Dr.

Taranissi's opinion should have controlled, Plaintiff argues, because he is her treating

physician and his opinion is supported by the record.

---

[17]In this domain, a child's ability to acquire and learn information and to use the information learned is considered.  20 C.F.R. § 416.926a(g).  A child of Plaintiff's age at the time of the hearing "should be able to *learn* to read, write, and do math, and discuss history and science."  20 C.F.R. § 416.926a(g)(2)(iv) (emphasis added).

[18]This domain requires a consideration of "how well [the child is] able to focus and maintain [her] attention, and how well [she] begin[s], carr[ies] through, and finish[es] [her] activities, including the pace at which [she] perform[s] activities and the ease with which [she] change[s] them."  20 C.F.R. § 416.926a(h).  Attention "involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance."  20 C.F.R. § 416.926a(h)(1)(i).

[19]In the domain of interacting and relating with others, a child's ability to "initiate and sustain emotional connections with others, develop and use the language of [her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others" is considered.  20 C.F.R. § 416.926a(i).

[20]A child's fine and gross motor skills are considered in this domain.  20 C.F.R. § 416.926a(j).

[21]In this domain, the following abilities are considered:  "how well [the child] maintain[s] a healthy emotional and physical state"; "how [the child] cope[s] with stress and changes in [her] environment"; and "whether [the child] take[s] care of [her] own health, possessions, and living area."  20 C.F.R. § 416.926a(k).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner v. Astrue**, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). "'Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.'" **Id.** (quoting Prosch, 201 F.3d at 1014).

Title 20 C.F.R. § 416.927(d) lists six factors to be evaluated when weighing opinions of treating physicians:  (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record."  20 C.F.R. § 416.927(d)(1)-(6).

Before giving the assessment at issue, Dr. Taranissi saw Plaintiff one time, in October 2008. At that visit, Plaintiff's mother reported that Plaintiff could not focus her attention at school, forgot instructions in class, could not complete her assignments, and would get out of her seat and walk or dance around the classroom. At home, she would knock a chair down and have a temper tantrum. With the exception of an irritable mood, however, Plaintiff's mental status examination was within normal limits, including her thought content and insight. She was alert, had good hygiene and eye contact, was dressed appropriately, and had fair judgment and a logical thought flow. Her GAF was at the high end of the range for moderate symptoms and was but one point less than the low end of the range for mild symptoms.[22] And, she had been out of her ADHD medication for two weeks.[23]

This October visit, occurring at a time when Plaintiff had not been taking her medication,[24] is the only record of Dr. Taranissi seeing Plaintiff. Dr. Taranissi's assessment did not account for Plaintiff's missed doses of medication. See **Owen v. Astrue**, 551 F.3d 792, 799-800 (8th Cir. 2008) (affirming ALJ's decision not to give treating physician's opinion controlling weight when physician had failed to account for claimant's

---

[22]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

[23]This lack of medication makes Dr. Taranissi's report that Plaintiff was compliant with her medication puzzling.

[24]The Court notes that this was not the first time Plaintiff had not been taking her medication. It had been stopped when she had her tonsillectomy; another time, the medication was disappearing and Ms. Mosley had to request skin patches.

noncompliance with treatment and medication when assessing degree of claimant's impairment). There is nothing in the administrative record to indicate that Dr. Taranissi saw Plaintiff when rating her functional limitations two months later. A one-time, thirty-minute session is insufficient to tip the consideration of the first two factors in favor of giving Dr. Taranissi's assessment greater weight.[25] See **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007) (affirming ALJ's decision discounting opinion of treating specialist "based on the infrequent nature of the treatment visits").

Consideration of the third factor, supportability, and the fourth, consistency, also does not favor giving that assessment greater weight. The only basis for the assessment is Ms. Mosley's description at the October 2008 visit of problems Plaintiff was having at school. Plaintiff had not returned to the Arthur Center in August, as Dr. Hall requested. The teacher's report in the second half of Plaintiff's kindergarten year was positive; this was when Ms. Mosley remarked about it being noticeable when Plaintiff missed a dose. The teacher's report following the first half of Plaintiff's first grade year was not as positive; this was following a time when Plaintiff missed at least two weeks of her medication. Clearly, the

_____

[25]Plaintiff argues in her supporting brief that Drs. Hall and Taranissi "are colleagues who are privy to the same information" about her. (Br. at 14.) This argument is unavailing. There is no evidence that the tenure of the two at the Arthur Center overlapped or that they ever discussed or jointly treated Plaintiff. Access to another doctor's treatment notes does not paint the "longitudinal picture of [a claimant's] medical impairment(s)" that the regulations consider as a factor entitling the treating source's medical opinion to greater weight than that of a consultative source. 20 C.F.R. § 416.927(d)(2). Additionally, as noted by the Commissioner, a treating source's medical opinion is given greater weight because, in part, the source's *unique* perspective" of the medical evidence. Id. (emphasis added). "Unique" is defined as "[o]f which there in only one; one and no other; single, sole, solitary." OED: Oxford English Dictionary, http://www.oed.com/view/Entry/214712?redirectedFrom=unique#eid (last visited May 11, 2011).

medication prescribed by Drs. Hall and Taranissi had a positive effect on Plaintiff's ADHD. An impairment that is controllable by medication is not disabling. See **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007). See also **Briggs v. Callahan**, 139 F.3d 606, 609 (8th Cir. 1998) (affirming ALJ's decision that child was not disabled when her hyperactivity was controlled by medication).

Also detracting from the weight of Dr. Taranissi's assessment was the degree of limitation found in domains that were not discussed during the October visit and were not, even when mentioned in the record, of the degree found by Dr. Taranissi. For instance, Dr. Taranissi rated Plaintiff as having an extreme limitation in the domain of acquiring and using information. Ms. Mosley reported having no concerns about Plaintiff's cognitive abilities when she was evaluated for a speech disorder. When applying for SSI, Ms. Mosley noted that Plaintiff had a problem doing only three of the eleven activities listed in this domain. See **England**, 490 F.3d at 1022 (affirming ALJ's finding that claimant did not have marked limitation in domain of attending and completing tasks when assessment by consultative psychologist that claimant was "markedly limited" in two activities did not comprise the entirety of the domain). The only special education service Plaintiff received in school was speech therapy. See 20 C.F.R. § 416.924a(b)(7)(iv) (noting that placement in special education services is not determinative of disability and that children may receive such services for many reasons). She had three IEPs: one for pre-kindergarten, one for kindergarten, and one for first grade. The first two IEPs had two goals each. The second of these was to achieve 80% accuracy in one area of concern and 85% in another. The third

IEP had only one goal, and that was to achieve 90% accuracy in seven *new* sounds. Thus, even in the area Plaintiff was found to need special education services, she was progressing.

Another example of the lack of supportability for Dr. Taranissi's assessment is the finding of a marked limitation in the domains of moving about and manipulating objects and caring for oneself. No concerns had been expressed about Plaintiff's abilities in either of these domains. Also, Dr. Taranissi's assessment consisted only of circling the degree of limitation for each domain. No explanation or support was provided.

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, as was Dr. Taranissi's, or when it consists of conclusory ratings, as did Dr. Taranissi's, see **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Consideration of the fifth factor, specialization, neither increases nor decreases the weight to be given Dr. Taranissi's assessment as there is no indication in the record of his or her credentials.

Plaintiff contends that the ALJ should have recontacted Dr. Taranissi if he needed "clarification or additional information." (Br. at 15.) This argument misapprehends the ALJ's finding. He did not find the report insufficient; he found it did not support Plaintiff's

claim of disability. "The ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting <u>Stormo</u>, 377 F.3d at 806). A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff. <u>See e.g.</u> **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).[26]

<u>**Conclusion**</u>

For the reasons set forth above, the ALJ's decision that Plaintiff did not have an impairment that met or functionally or medically equaled an impairment of listing-level severity is supported by substantial evidence on the record as a whole. Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be AFFIRMED and the case be DISMISSED.

The parties are advised that they have **fourteen days from this date** by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1),

---

[26]Plaintiff's reliance on **Bowman v. Barnhart**, 310 F.3d 1080, 1085 (8th Cir. 2002) is unavailing. In that case, the Eighth Circuit found that the ALJ had erred by not contacting the claimant's treating physician for clarification of "numerous entries" over the course of thirty years indicating office visits or telephone requests for prescription refills and by relying instead on the report of a nonexamining state consultant. In the instant case, the treating physician saw Plaintiff one time.

unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. <u>See</u> **<u>Griffini v. Mitchell</u>**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>18th</u> day of May, 2011.